Call the first case of the morning. 513-0592, Suvad Kajtazovic v. Workers' Compensation Commission. Counsel, you may approach and proceed. May it please the court. My name is Frank Neeson III, and I represent the appellant in this matter, Suvad Kajtazovic. I have three points on appeal to discuss with you today, and I'm not going to get into the standard of review. I'm sure during the last two days you've heard about the manifest weight of the evidence quite a bit. Mr. Kajtazovic had a serious left lower leg injury on December 8, 2007. A heavy metal object fell, fractured his tibia and fibula. That was not disputed by the respondent. No, it's not. Dr. Gross described this, and I don't know if this panel is familiar with the Joe Theismann injury from Monday Night Football with Lawrence Taylor. That's not. Yeah, kind of like that. That's what we're looking at. Afterward, he had metal put in his leg. Later on, he had a knee surgery. After that, he had the metal removed from his leg. This matter was heard before Arbitrator Luskin on February 29, 2012. He gave Suvad 37.5% PPD disability of his lower left leg. He indicated that there was no relationship between the alleged psychiatric problems that Suvad had and the work accident. In addition, he awarded a credit to the employer for overpaid TTD in the amount of $34,389.39, resulting in current liabilities of an additional $533.33. One of the things we need to hone in on, and I think this is the overarching specter over this case, as you probably noticed, was there were some credibility issues, I think, that the commission and the arbitrator had with the claimant. First of all, the witnesses reported that he didn't strike a set at any time, so that was an issue. They reported symptoms, magnification, as you know. He was not cooperative in treatment. They did a video that engaged him. So I think there's an underlying theme here of the credibility and the efficacy of the claimant's testimony, which really is normally within the province of the commission. So what do you have to say about that? Well, with respect at least to the psychiatric issue, which I'd like to get to because I think with my first point, I think the commission's decision to find no causal relationship between his psychiatric problems and the work accident is against the manifest weight of the evidence. The commission based that opinion, or that decision, excuse me, on Dr. Stillings' report. And Dr. Stillings was a Section 12 psychiatrist hired by the employer, met with Suvat. The arbitrator found that Dr. Stillings had a much better understanding and more information, did a records review, and he had a better understanding of this than the claimant's own treating psychiatrist, Dr. Rao. Yeah, because he didn't see him that often, did he? Who? Rao? Yeah. Rao saw him 15 times I think throughout the course of this case. Over 30 months of treatment? Yeah. Uh-huh. Okay. So, and what I'm trying to say here is that that's just untrue. Dr. Stillings had the same records that Dr. Rao had. Dr. Rao did a records review before his deposition. Dr. Rao had basically the same information that Dr. Stillings did. And the reason that Dr. Stillings' opinions in this case are against the manifest weight of the evidence is, he pins all of this psychiatric on pre-existing problems. And he relates those problems to Subodh's experiences during the Bosnian War. Okay? Subodh didn't have any experiences during the Bosnian War. Subodh's testimony is, I got the heck out of there. I went and I left my home and I traveled about 20, 30 miles across the border to Croatia. I stayed with my in-laws for seven years. And when I asked about this, and Dr. Stillings characterizes this as seven years of hell. Okay? And I kind of- He jokes his in-laws? Yeah, jokingly said that seven years of hell. I mean, I don't know what his in-laws are like, but maybe Dr. Stillings has horrible in-laws. But that's just not true. And then I asked Dr. Stillings in his deposition, well, did Subodh, was he in combat? Was he in a concentration camp? Was he shot at, bombed? Did he see dead bodies? Did he have anybody, any relatives killed during the war? The answer to all these is no. He was just with his in-laws? He was with his in-laws. Let's set aside the in-law issue for a moment. What's the genesis of the psychiatric, I mean, was the result of him allegedly striking his head on the floor? And that's the other thing I wanted to get to. It seems that the arbitrator seems to think that there has to be a striking of the head to relate this to the work accident. That's totally untrue. And when I asked Dr. Rao about that, if you look at the deposition testimony, it's in my brief. I said, Dr. Rao, does it matter whether or not Subodh struck his head? Would your opinion be the same? He said, my opinion would be the same. And the only difference would be that there would be a possibility of post-concussion syndrome associated with this. So on top of all that, okay, and I'm citing to these BMS catastrophe case and the Kawa case, which I think four of you have decided. I went and got the medical records from prior to this work accident from his primary care physicians. He had a couple of them he went to. Originally Bosnian folks, doctors, Dr. Karic and Dr. Karic. And I went to get those to see, did this guy have any psychiatric complaints prior to the work accident in December of 2007? There were none. Nothing. And I think that relates to establishing that he was a healthy individual. His complaints were, you know, I had rhinitis, I might have a rash, that kind of thing. There's nothing in there that can be construed to say, you know, that he's got this chronic pre-existing personality disorder that Dr. Stillings bases on a Bosnian war experience that didn't exist. Well, let's put Stillings aside for a second. Sure. We have Dr. Katz. Didn't Dr. Katz basically opine he felt that the claimant was, again, exaggerating his condition? Sure, he says that, yeah. And why is this theme running through all of these doctors' opinions? Dr. Katz also is, again, hired by the employer to see Suvat. And if you look at the timing of Dr. Katz seeing Suvat, I think it's important, and this sort of ties in with my second point relating to the TTV issue. On August 28, 2008, Suvat goes and sees Dr. Watson, who's one of his treating orthopedic doctors at SLUCare. And when he goes to see Dr. Watson, he tells him a couple things. I was in physical therapy, they made me do a left leg press, and I hurt my knee, okay? And ironically, during that same medical record, that's what the arbitrator and the employer rely on to say that, well, he can go back to work now. Because there's some mention of, I would not restrict his overall activities, I think is the quote, in there. So Suvat complains, I hurt my knee, I stopped going to physical therapy until I could see you about it, and he changes the weight restrictions. After that, he continues to complain, hey, my knee hurts, my knee hurts, my knee hurts. Everybody says, oh, you're incredible. Dr. Katz says, oh, he's walking fine, he's incredible. He keeps complaining about this. Who's Dr. Gross? Dr. Gross is an orthopedic doctor hired by the employee to do an IME. You saw him several times. And what did he say about your point? Same type of thing. He exaggerated. Exaggeration. But my point getting back to that was, in, I think, late January of 2009, these complaints, finally the doctors get the MRI approved by Work Comp. They do the MRI, and they think he's got a torn meniscus. So this guy that's incredible, that's making all this stuff up, turns out that he's right. He had a problem with his knee, and he has surgery on it on St. Patrick's Day of 09. Who's Dr. Musich? Dr. Musich was an IME doctor hired by us. Okay. So he goes to Dr. Musich, who you're going to say is objective. Musich says that his poor and inconsistent effort in physical therapy could explain his apparent lack of post-operative progress, and that the claimants' report of complaints couldn't be explained by symptom magnification or lingering. And this is your guy, right? That is my guy. And I agree with that. Does it play a role for the claimant? It does. It's playing with all these other doctors as being the respondents' experts. Okay. What about your expert? Sure. If you'll notice, it seems to me that throughout the record, you don't see this problem with the physical therapist, complaints about poor effort or anything like that, until after he hurts himself in August of 2008, doing that leg press. And it seems like after that, he doesn't trust these people at all. There seems to be a lot of doctors who are saying that the claimant is engaging in symptom magnification. There's several doctors that are saying that, including your own expert. Doesn't that way, can't the commission take that into consideration? Yes. I mean, you can take that into consideration, but again, that's mostly with regard to his physical complaints. If they don't believe that, why would they believe a psychiatrician? It's even more difficult if I have objective findings on it, isn't it? About his physical complaints? Psychiatrician. Oh, okay. Again, I mean, I think the record is very clear and establishes that Subodh had no prior psychiatric problems. What is his problem? I mean, what is the diagnosis of his psychiatric problem? I think major depressive disorder was Dr. Rao's diagnosis. Depressive disorder, NOS, I think was diagnosed by Dr. Stillings. And how is this linked to having a compound fracture of your leg? Well, it relates to a person that... It happens every day, so I mean... It doesn't happen every day. I mean, again, if you watch the Joe Theismann, it's going to change your life. People break their legs. Yeah. Okay. And it's a horrible injury. And this guy went from being a hard worker, he was even recognized for getting to work when it would snow really bad and no one else would show up and things like that, to he can't do anything. And I think that caught up with him after having metal put in. And then you start to see the psychiatric part of this with him complaining to his primary care physician and then going to see Dr. Rao when he finally has his MRI on the left knee and says, hey, you need surgery again, pal. And that's when... I mean, he goes into the psych ward with suicidal ideation in July of 2009. So, I mean, this is a real thing. And I think that's where it all comes in. And I think part of the problem that we've got here is a lot of the psychiatric problems that Subodh has carries over to his relationship with all these doctors that he sees where he just, you know, he acts like a jerk. I can't get around that. I mean, even Dr. Rao, his own treating psychiatrist, he gives him these depression inventories when he goes to his office and half the time he doesn't want to fill them out. He just throws them back. Well, he goes to the doctor to get prescriptions, doesn't he? Yes. Okay. I mean, yeah. Okay. So, moving on to my second point, which is the overpayment of TTD, if you look at the different sections and periods of time, and I've talked about the first one between August 28, 2008 and March 16 of 2009, the commission essentially said, well, yeah, he had this problem with his knee, and during that period of time we're going to say he could work. Now, mind you, during August 28, 2008 to March 16, 2009, the employer didn't offer him a job back. Didn't say, hey, come on back and work for us. He went to see Dr. Katz in November of 2008, and, you know, Katz says what he says, you know, I don't believe this guy, and he looks like he's symptom magnifying and whatever else. They continue to pay him the TTD. But essentially the commission is saying, well, yeah, we think you can work up to the date of your surgery on your knee, which we find that's required to alleviate your pain, okay? So he's supposed to go during that period of time with a bum knee without TTD up until the date of the surgery? I don't think that makes any sense. The second period of time that the commission credited back to the employer was August 14 of 2009 to July 1, 2010, and they based that on Dr. Gross's opinion. Now, during that period of time, the SLU care physicians, these orthopedic treating doctors, filled out five different patient status reports. These patient status reports are basically a work comp form that, you know, they fill out and say, well, what are your restrictions, can you return to work, that kind of thing. Each and every one of those patient status reports during that period of time says cannot work. In fact, all the patient status reports in the record say this guy cannot work. Okay, so essentially the commission is now trying to pick and choose different opinions. So, yeah, we're going to use Dr. Watson's opinion from here to say that, you know, that he can work from August 28 to March 16, but we're going to ignore Dr. Watson when he says this guy can't work at all for that next period of overpaid TTD. See what I'm saying? They're saying, well, Dr. Gross, we can use that here because he says that here. So there was no finding of incredibility for any of the SLU care doctors by the commission, by the way. He didn't say these people are not credible or anything along those lines. And I think that, am I over my time? Yes, you are. I'm sorry. You will have time on the clock. Okay. All right. Thank you. Good morning. May it please the court, my name is Dave Clinton, and I represent the employer Appalachia F. Keystone. I would suggest to the court that the claimant in this case is asking you to assume the role of the commission, to assess the credibility of the witnesses, to weigh the evidence, to resolve conflicts in the evidence, to interpret the medical testimony. The commission based its decision on five pages of single-space facts, very few of which are even mentioned by the claimant in his brief. And based on those facts, it's our position that he has not shown that the commission's decision as to each of the disputed issues is against the manifest weight of the evidence. Since that, an opposite conclusion is clearly apparent. At page six of its decision, the commission, before discussing each of its issues that is decided, made the finding that the claimant lacked credibility in this case, and that his lack of credibility should be considered and be informative as to each disputed issue that was decided. That finding was not appealed by the claimant in this case. It's our position that it was waived and that he has conceded that finding of the commission that the claimant herein has no credibility. I would suggest to the court that the only credible chain of events in this case are the repeated instances of claimant's treatment, noncompliance, noncooperation, and his many instances of exaggerated symptoms and disability complaints. And these are not only documented by the respondent's IME doctors. This started with claimant's treating physicians and his therapists, and it continues for almost a period of four years. In my brief, I lay out three pages of instances of this credibility issue that the claimant has. I think we touched on some of them. We tried to point some of them out. But his response is probably going to be, well, of course, because he has the psychiatric condition that was the result of the accident. So he's going to be a little bit off at times. The psychiatric condition, as testified to by Dr. Stillings, and let me preface my comment by Mr. Neeson asked Dr. Stillings on cross-examination, are you aware of any preexisting psychiatric symptoms, diagnosis, or treatment? Dr. Stillings said no, he was not. That this man's problem was a preexisting personality tendencies to magnify illness, to exaggerate complaints, and to manipulate. What did he base that on? He based it on personality testing, or psychological testing. He did administer certain psychological testing? He did. His evaluation consisted of a complete records review, a mental status examination, a psychological testing. This is Stillings? Stillings, over the course of two days. Dr. Ray, on my cross-examination, admitted that he did not perform any psychological testing on this man, and was unaware of his pre-accident personality traits. And so I would suggest to the court that Dr. Stillings' diagnosis in this case is point on. It's consistent with what all the treating physicians and therapists have documented over the course of a four-year period. Now, Dr. Rayo. Yes, sir. He was under his care for 30 months, correct? Correct. And Rayo saw him how many times? 11, 15 times, 11 to 15 times. And he conducted no tests? No psychological tests. No psychological tests? No, sir. And for 30 months? In fact, he was not qualified to do so, although he admitted that he did, on occasion with patients, would refer patients out for psychological tests. But he was able to write scripts, though? Yes. Yes. I would point out to the court that what's very telling in this are the bookends of the instances of this credibility issue. Back in June of 2008, this is six months post-accident, his treating orthopedic surgeon, Dr. Watson, told him to stop using the crutch. That instruction was repeated over the course of years by all his treating physicians, Watson, Kiefer, and Dr. Kuttick, and it was ignored on each and every occasion by the claimant. And almost four years later, this man showed up at arbitration using a crutch. Now, opposing counsel, and I may not have the time frame correctly, does mention that he had a complaint of a knee situation which was objectively verified through a surgery as a meniscus tear. Now, is that why the crutch possibly is being used? I mean, that seemed to be, I think, the tenor of the argument. I would suggest not, Your Honor. I believe if you look at this record, I think not only did the doctors, but the commission was very, I mean, they went overboard for this man. They gave him the benefit of the doubt. The man continued to complain of knee problems, and so the doctors are looking for answers. And so they performed a diagnostic arthroscopy with the possibility of maybe finding a meniscus, and they found normal ligaments and cartilage. And they did an abrasion arthroplasty for a symptom, what they felt might have been a symptomatic plica. And that record shows that he was discharged ambulating without any ambulatory aid. So he got up and walked away from that outpatient surgery. The final point, I would suggest to the court, you don't even have to get to the psychiatric opinions in this case. You can look at the documents. This man originally alleged a left leg injury. There's no question he sustained that. A year and a half later, he alleged a head and psychiatric injury. However, his testimony at arbitration was, at the time of my leg injury, I hit my head on concrete. I was in and out of consciousness, and ever since that day I have suffered recurrent headaches, and ever since that date I have suffered these multiple depressive-type symptoms. That testimony is contradicted by his application itself. If he was aware of those immediate injuries at that time, they should have been listed on the application. And it's contradicted by his own medical records, where multiple hospitals, doctors, and therapists make no mention of a head or psychiatric symptom for 16 months until March of 2009 when he consults Dr. Rayl for the first time. And so I would suggest to the court that based on those contradictions, together with the commission's finding that this man is not credible, that is sufficient evidence to deny any alleged head or psychiatric injury. You then can go to the psychiatric testimony if you wish. We would suggest that. And I argued in my brief that Dr. Stillings is, or the commission found Dr. Stillings within his province to be more credible, more qualified. How about the TTD? I addressed each of those periods in my brief, and I believe that there is medical evidence. The point I would make, and the commission says again, that this man's lack of credibility should be informative and considered with respect to each disputed issue. And so I think when you look at those TTD periods and the commission's award is supported by the various medical evidence, but at the same time they are considering that in the light of this man not being a credible witness. So on behalf of my client, I would ask that you affirm the circuit court's order affirming the commission's decision. We've had five individuals look at the facts in this case, and they all agree. An arbitrator, three commissions, three commissioners, and a circuit court judge. Thank you. Thank you. Counselor? Counselor, you may reply. It may please the court. I do have one question. Absolutely. He received social security disability. Yes, he did. Was that for the psychiatric or the physical? Both. Both. Yes. Okay. You'll note that my opponent did not at all address the issue of Dr. Stillings' account of the Bosnian War because it's totally inaccurate in his argument. But he did opine that Stillings, unlike Rao, administered some kind of a personality psychiatric testing tool, and Rao did not. So what's your response to that? Well, let's look at that. I have this in my brief. Dr. Stillings gave Subodh a test that I don't think that he should have. I mean, this is supposed to be completed in a half an hour. I don't think it's supposed to be given to people that don't speak English. Their reading levels, he said, I don't know whether or not the interpreter in this instance had an eighth grade reading level or not. Where did the interpreter come from? I don't know. They hired him, so I really don't know. But it took him two hours to complete this test when normally it takes a half an hour to do. But let's look at the questions on this MCMI-3, and these are the questions that Stillings bases his opinion that there's preexisting. I have a hard time, he answered true to the following, I have a hard time keeping my balance when walking. Now understand, this guy had a severe fracture of his legs. Of course he's going to say true. I very often lose my ability to feel any sensation in parts of my body. Again, lower leg, he's had those complaints. I feel shaky and have difficulty falling asleep because of painful memories of a past event keep running through my mind. Same thing. How did he answer that question? True. True to all these. I mean, his answer to all these is true. I thought he didn't have any bad experiences in Bosnia. Why did he answer true? Because the past event is his leg being snapped in half, instead of being in body. He didn't go through the war in Bosnia. Yeah. I feel shaky and have difficulty falling asleep because painful memories of a past event keep running through my mind. Okay. The answer is true to that. And then those are health preoccupation questions. Okay. And then many people have been spying into my private life for years. They hired somebody to spy on him, and he caught him when he was going to physical therapy and said, this guy's following me around. So all these things can be explained. Now, when I asked Dr. Stillings about, well, do you take that into account when you're interpreting these psychological tests? And he says, no. No, no, no. The testing doesn't know that, okay? So basically, he doesn't take into account that Subodh has had this horrible injury to his lower left leg when saying he's got a health preoccupation and answering true to these things. So that's how he gets to the conclusion that he's got this preoccupation. Well, who's supposed to make a determination as to whether that's proper or improper for a doctor to take that into consideration? Well, I think he should. Don't you? Well, I'm not a doctor. Are you? No, I'm not either. Well, then the question becomes, when interpreting this medical evidence, isn't it the function of the commission? It should be, and the commission should have paid attention to the evidence. I went out and actually had to subpoena these questions to see, well, hey, Stillings, what are you actually basing this on? I just don't want to see a spit out of a report that you say, well, he's got, you know, a preexisting problem. And then what turns out, I didn't take into account that this man had a horrible fracture to his lower left leg. And that's the situation. And so that's how you're getting to your conclusion. That's just wrong. I mean, I don't think I have to be a doctor to be able to tell you that. It's pretty clear to me that if you don't take those kind of things into consideration, you know, you're taking somebody that's just perfectly fine. Did you move to strike his testimony for improper foundation, that he wasn't an expert because of these answers? I don't think I did. I didn't have them on. So it's weight. Yeah. So what weight should be given to that testimony? I mean, he didn't say he consulted the entrails of chickens, did he? No, and I expected that. But it's kind of like looking into a crystal ball and saying. Do you know that example by now? Yeah, I've heard that on the podcast. It's called loggery. But it's like looking into a crystal ball and saying, I know what this guy was like before this accident happened. And I don't think you can do that in this case. And I think the medical evidence that I presented at trial shows that this guy didn't have any problems like that. I'd ask that the court reverse the decision of the commission and remand it in accordance with my request in the brief. Thank you. Thank you, counsel, both for your arguments in this matter. We take them under advisement, and a written disposition will issue.